## THE COMMONWEALTH ELECTRIC COMPANY

### *v.*

### MARY B. ROSE, Admx.

*Opinion filed February 21, 1905—Rehearing denied April 6, 1905.*

1. NEGLIGENCE—*what tends to show negligence on part of electric company.* Evidence that a wire carrying a heavy current of electricity was not protected by guard-wires and was poorly insulated, in violation of the requirements of the ordinance under which the company owning the wire was operating, tends to show negligence upon the part of the company.

2. SAME—*when question of cause of the injury is for the jury.* Whether an electric shock received by a telephone lineman was the efficient cause of his death, which occurred about half an hour after his fall from the pole where he was working, is properly left to the jury, under evidence that he received a heavy shock, lost his footing on the cross-arm where he was standing, and hung suspended by his arms for several seconds, without speaking or attempting to regain his footing, before he dropped to the ground.

3. SAME—*question of contributory negligence is ordinarily one of fact.* Whether a telephone lineman was guilty of negligence contributing to his fatal injury in standing upon a steel cable and in not wearing a belt is a question of fact for the jury, where there is

214—35

evidence tending to show that under the particular circumstances the position assumed by him was the proper one and that there was no necessity for wearing a belt.

4. SAME—*when instruction as to ordinary care is not prejudicial to defendant.* An instruction given for the plaintiff in an action for the death of her husband, a telephone lineman, stating that "ordinary care, as mentioned in these instructions, is that degree of care which an ordinarily prudent person, with *deceased's knowledge or means of knowledge of electrical affairs,* and situated as deceased was, before and at the time of the accident, would exercise for his own safety," is not prejudicial to defendant in using the italicized words, or as assuming that deceased had properly placed himself in the position he was in when he fell.

5. SAME—*when violation of ordinance is prima facie evidence of negligence.* An ordinance granting the right to an electric company to erect poles and wires, and requiring the company to properly insulate the overhead wires and to protect them by guard-wires "or other suitable mechanical device or devices," has the force of a statute, and a violation thereof by the company after accepting the ordinance and availing itself of its benefits is *prima facie* evidence of negligence.

6. ESTOPPEL—*a corporation accepting ordinance is estopped to repudiate its conditions.* An electric company accepting, without qualification, an ordinance containing conditions respecting the manner of constructing and maintaining its poles and wires, is estopped, after availing itself of the benefits of the ordinance, to repudiate such conditions.

7. TRIAL—*remarks of counsel, if justified by the facts, are not a ground for reversal.* Counsel, without exceeding the limits of legitimate argument to the jury, may arraign the conduct of the parties and impugn or condemn their motives, so far as they are developed by the evidence, or assail the credibility of a witness, when he is impeached by direct evidence or by inconsistency or incoherency of his testimony, his manner of testifying, appearance on the stand, or other circumstances.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

This is an appeal from a judgment of the Branch Appellate Court for the First District, affirming a judgment for $5000.00 rendered against the appellant company in favor

of the appellee in the Superior Court of Cook county in an action on the case, prosecuted to recover damages on account of the death of Joseph H. Rose.

The declaration consists of two counts. The first alleges that on and prior to June 28, 1897, appellant was an Illinois corporation; that the city council of Chicago passed an ordinance, granting to appellant the right to construct, maintain, operate and use on certain streets in Chicago a line of wires, or other electric conductors, for the transmission and distribution of electricity upon certain terms contained in the ordinance; that a part of said ordinance was as follows: "All conductors and wires, owned and operated by the said company under the provisions of this ordinance, shall be properly insulated, and all overhead conductors, used by said company, shall be protected by guard-wires or other suitable mechanical device or devices;" that appellant accepted said ordinance, and, under the same, conducted an electrical business; that on May 10, 1901, appellant had a certain wire, used as a conductor of electricity, and heavily charged therewith, running north and south on Parnell avenue within said city; that said wire was suspended above the ground upon poles and extended across Sixty-seventh street; that, by virtue of the ordinance, it was appellant's duty to maintain said wire in a properly insulated condition, and have it protected by guard-wires, or other suitable mechanical device, but that it wantonly and negligently permitted said wire to become and remain in an improper and defectively insulated condition, and unprotected by guard-wires, or other suitable mechanical device, as required by said ordinance; that Rose was employed as a lineman by the Chicago Telephone Company, which had certain wires running across on poles at the intersection of Sixty-seventh street and Parnell avenue as aforesaid; that, while Rose in the discharge of his duty was on one of said telephone poles, and exercising ordinary care, etc., said telephone wire, by reason of appellant's wire not being protected as aforesaid,

came in contact with the same, and, by reason of appellant's wire not being properly insulated as aforesaid, it discharged a sufficient current of electricity through the said telephone wire, and into the body of Rose, as to cause him to fall from the pole to the ground, as a result of which he was then and there killed; and that he left surviving him a widow, the appellee herein, and three children, his next of kin.

The second count charges that it was necessary for the reasonable safety of those, who might be required to work with or about said wires, or who should be brought into contact with appellant's said wire, that appellant should maintain said wire in a properly insulated condition, but that it wantonly and negligently suffered and permitted its said wire to remain in an improper and defectively insulated condition.

The following are the material facts: Appellee's intestate, who was a lineman in the employ of the Chicago Telephone Company, about forty-three years old at the time of his death, met his death at the corner of Parnell avenue, a street in Chicago running north and south, and Sixty-seventh street, running east and west, in the said city. A line of the Chicago Telephone Company's poles and wires extended along the south side of Sixty-seventh street, and a line of appellant's electric light poles and wires extended along the east side of Parnell avenue. The appellant's electric light wires passed under the wires and cable of the telephone line, about two feet lower than the lowest telephone wire or cable. There were two of appellant's electric light wires, each carrying a current of 2000 volts, while on each of the telephone poles there were five cross-arms, each having pins for ten wires. The distance between these wires on each cross-arm was about twelve inches, except the two next to the pole, which were sixteen inches apart to allow for the pole. At the south-west corner of Parnell avenue and Sixty-seventh street stood one of the telephone company's poles, designated as pole No. 2. One hundred and twelve and three-fourths

feet east of this pole was another telephone pole—the one, at which deceased was at work—designated as pole No. 1. One electric light pole was nineteen feet north of Sixty-seventh street, while the next one south was sixty-four feet south of Sixty-seventh street—which was about seventy feet wide—making these two poles about one hundred and fifty-three feet apart. The lowest cross-arm of the telephone poles was thirty feet, and the electric light cross-arm twenty-eight feet and two inches above the ground. One of the witnesses states that there was only one and one-half feet between the electric light wire and the telephone wire above it. From pole No. 2 to the electric light wires was thirty-six feet, and from the electric light wires to pole No. 1 was seventy-six feet. The telephone line crossed the electric light wires at practically the middle of the electric span, which was about one hundred feet. There were from thirty-six to forty wires on the telephone poles. Stretched along on the telephone poles was a steel cable, or "messenger," firmly attached to the poles, used to support a large number of telephone wires, enclosed in a lead tube or casing. This was attached to the pole twenty-two inches beneath the lowest cross-arm of pole No. 1, and three feet and nine inches below the lowest cross-arm of pole No. 2. The cross-arms were about twenty-three inches apart.

On May 10, 1901, the deceased, and four or five other members of his gang, left their work at some other part of the telephone lines, and came to the corner above described at about 2:30 P. M., their aim being to take down two dead wires, which extended east from the west side of Parnell avenue to Stewart avenue, and extend a new wire along on the third or middle cross-arm, beginning at pole No. 2, and running east. The plan was to cut off the dead wire, or wire not in use, on the bottom cross-arm of the telephone pole, and attach it to the new wire, and by this means draw the new wire from pole 2 to pole 1, it being the intention to get the new wire across and above the electric light wires.

The dead wire, which was on the lowest cross-arm and was to be cut at pole No. 1, was to be taken up to the middle cross-arm about four feet above, and the new wire was to be fastened to it at the west pole, and then the new wire drawn across from pole No. 2 to pole No. 1, and so on.

The deceased climbed pole No. 1, which was about sixty to seventy feet east of Parnell avenue, and Clark, another of the men, went up pole No. 2 at the south-west corner of Parnell avenue and Sixty-seventh street. Clark stood with one foot on the lower cross-arm and the other leg hooked over the next cross-arm above, and in this position on the west side of the pole detached the old wire from the pin on the bottom cross-arm, raised it to the middle cross-arm, and united it to the end of the new wire, and fixed it so as to hold it at that point. The deceased at pole No. 1 stood on the steel cable on the west side of the pole facing south-east, the wire which they were raising being on the south side of the pole. The deceased waited for Clark to get his end up on the third arm and spliced before going further, and, when Clark finished fastening the new wire to the old, he placed his hand in the loop of the wire, and holding it that way, placed his hand on the cross-arm, touching a guy wire which was there. Clark said: "All right," to the deceased who was already waiting, and thereupon the deceased cut the wire just west of the cross-arm preparatory to carrying it higher. In some manner, after it was cut, the wire came in contact with the electric light wire beneath it, and Clark and deceased both received an electric shock. Clark did not receive the full force of the shock, and then only through a small part of the hand, but it made him jump, although he did not fall. The deceased, however, was standing on the cable, which, in turn, was grounded, thus completing a circuit with the electric light and telephone wires. At the same time when Clark received the shock, deceased cried out, "Oh!" and a flash was seen at his end of the wire. After this exclamation deceased was seen by his fellow-work-

men hanging to the cross-arm with his arms, having lost his foothold. He hung there a few seconds without saying anything further, or being able to regain his footing, and then fell to the sidewalk beneath, and died in a half hour or so afterwards. Upon examination it was found that the telephone wire had been burned in two where it came in contact with the electric light wire.

F. J. CANTY, and J. C. M. CLOW, for appellant.

JAMES C. McSHANE, for appellee.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The facts of this case are settled by the judgment of the Superior Court of Cook county, and the judgment of the Branch Appellate Court for the First District affirming the same, in favor of the appellee. At the close of the appellee's evidence, and again at the close of all the evidence, the appellant asked the court to give to the jury a written instruction, requiring them to find the defendant not guilty. The instruction thus asked was refused, and the only question for us to consider, so far as the evidence is concerned, is whether or not the proof tends to sustain the cause of action.

*First*—The evidence tends very strongly to show that the appellant company was guilty of negligence, as charged in the declaration. The ordinance, referred to in the statement preceding this opinion, and the material part of which is set out *in hæc verba* in the declaration, required the appellant company to properly insulate all the conductors and wires, owned and operated by it under the provisions of the ordinance, and also required appellant to protect all overhead conductors used by it, by guard-wires, or other suitable mechanical device or devices. The proof is practically without contradiction that there were no guard-wires to protect the electric wires, used by the appellant at the intersection of

Parnell avenue and Sixty-seventh street, where such wires passed under the wires of the telephone company, running east and west. Guard-wires are defined in the evidence as being wires running parallel with the electric wires and above them, "so as to keep anything from above dropping upon them;" and there are usually three of the guard-wires, one on each side of the electric wires, and one above them. The guard-wires have no electricity in them. One of the witnesses testified: "There were no guard-wires at the street intersection." The following is the testimony of another witness: "Q. Were there any guards there?—A. No, sir; no guards." The proof also tends to show that the electric light wires were not protected by any other suitable mechanical device. As the plats and diagrams in evidence, and the statements of the witnesses, show that there was nothing at all over the electric light wires there could have been no other device over the electric light wires, as a protection. The testimony tends to show that, if there had been such guard-wires over the electric light wires to protect them, no electric shock would have been produced, when one of the telephone company's wires, stretched above the electric light wires, fell upon the latter, and came in contact with them.

The evidence also tends to show that, at the time the accident occurred, the electric light wires were not properly insulated, as required by the ordinance. The absence of proper insulation is sustained by the testimony of both sides. The insulation was a sort of rubber covering, and is described by the witnesses as having been in a rough, frayed condition, so that little strips were hanging from it. It is also stated by some of the witnesses to have been worn off in a great many places at that point. It was in a ragged condition. One of appellant's witnesses states that the insulation in some places was very bad, and gave, as a reason why he regarded it as bad, that he saw "strings hanging down." The insulation is stated to have been made of some kind of non-conducting fiber, soaked in a moisture-proof compound,

and also non-conducting material, which adhered closely to the wire. As one of the purposes of insulation was to keep out water, it was in a defective condition as soon as it began to loosen. The testimony tends to show that, if the electric light wires of the appellant had been properly insulated, the electric shock, which, either alone or in connection with other causes, caused the death of Rose, would not have occurred when the telephone wire over the electric light wires fell or swayed, so as to come in contact with the latter.

While the appellant does not seriously oppose the contention, that there was an absence of such guard-wires and insulation, as were required by the ordinance, yet it claims that the injury was not caused thereby. The evidence tends to show that the swaying or falling of the telephone wire, so as to come in contact with the electric wires beneath it, was an almost necessary result of the character of the work, which the deceased and his fellow-workmen were doing. The proof is quite clear that the deceased did receive an electric shock, produced by the contact between the two classes of wires. The witness, Clark, swears that he received a shock, and let go the wire, and that he and the deceased both had hold of the same wire, so that the same shock, which caused Clark to "jump," passed into the body of the deceased. Clark says: "Everything was all right and then I told him I was ready, and the next thing I knew I received the shock, and I immediately let go and got my hand in the clear. It came from the electric wire between Rose and myself. It was the same thing he got; the same shock. We both had hold of the same wire. When I got shocked, it caused me to let go and jump to one side, but I did not lose my footing." The witnesses speak of seeing a flash, and of hearing the deceased utter the exclamation, "Oh!" at the same time when Clark received the shock. Even if it were true that the accident may have been caused partly by the fact, that the deceased slipped from the cable or strand on which he was standing, yet it is also true that the shock in

question aided and contributed to his fall from the position where he was at work. It was a fair question for the jury, under the circumstances, to decide whether or not the shock was a concurrent and efficient cause of the fall of deceased. Where an injury is the result of the negligence of the defendant and an inevitable accident, or an inanimate thing has contributed with the negligence of the defendant to cause the injury, the plaintiff may recover, if the negligence of the defendant was an efficient cause of the injury, and the injured or deceased party was in the exercise of ordinary care for his own safety. (*Pullman Palace Car Co.* v. *Laack,* 143 Ill. 242; *Chicago and Alton Railroad Co.* v. *Harrington,* 192 id. 9).

The case at bar is somewhat similar in its facts to the case of *Economy Light and Power Co.* v. *Sheridan,* 200 Ill. 439, and the principles of law there announced are applicable here. In the *Sheridan case, supra,* it was said, where the plaintiff's intestate came in contact with an electric light wire, and received an electric shock, which threw him from the pole upon which he was working to the ground, and caused his death, that "there was no direct proof that the deceased came in contact with the electric light wire, and that he received an electrical shock which threw him from the pole to the ground, but from the facts and circumstances proven it might fairly and reasonably be inferred that such was the cause of his death. That such was the fact was susceptible of being proven by circumstantial, as well as by direct, testimony."

We are of the opinion that the evidence tends to show that the appellant company was guilty of negligence in the respects above indicated, and that such negligence was the cause of the injury to the deceased.

*Second*—The next question, which arises under this branch of the case, is whether or not the deceased was in the exercise of ordinary care for his own safety at the time when the accident occurred. This was a question of fact for the

determination of the jury, and was submitted to them, as we think, under proper instructions. It is claimed by the appellant that the deceased was guilty of contributory negligence upon four alleged grounds: First, that he knew of the defective condition of the electric light wires; second, that his position upon the pole was not proper; third, that he should have worn a belt; and, fourth, that he should have worn rubber gloves. The evidence does not show conclusively that the deceased had actual knowledge of the absence of the guard-wires, and of the improper condition of the insulation. The wires were some twenty-eight or thirty feet above the ground, and some of the testimony is to the effect that it was not possible for a person, standing on the ground, to see the exact condition of the wires overhead. The proof shows that there was some conversation among some of the men, while going from a former job, upon which they had been at work, to the corner of Parnell avenue and Sixty-seventh street, in reference to the defective condition of the wires as to insulation, but it is not clear that this conversation was heard by the deceased. On the contrary, the testimony tends to show that the knowledge of the witnesses, testifying as to the defective condition of the electric light wires, was acquired by them after the accident occurred, and not before the occurrence of the same.

It is said that the deceased was guilty of contributory negligence, because he stood upon the steel cable or "messenger" attached to the poles, whereas Clark, one of the men who was at work upon the pole west of the one where the deceased was working, placed himself, or a portion of his body, upon one of the cross-arms of the pole. There is evidence, however, tending to show that the circumstances, under which the deceased was at work, were different from those under which Clark was at work, and that the position of the deceased, while standing upon a firm steel cable carrying no current, left him free to use his hands in doing his work, and was a convenient and proper mode of doing the

same.   There was nothing to show that the deceased had any reason to expect a shock, and it was for the jury to say whether or not the position, which he occupied while doing his work, indicated that he was guilty of negligence.

It is also said that the deceased was guilty of negligence, because he did not have a belt attached to the pole at the time he received the shock.   There is evidence, tending to show that the belt is used ordinarily in construction work, or a different kind of work from that in which the deceased was engaged.   It also appears from the proof, that the presence of a belt would have been a hindrance, as the deceased, in cutting and raising the wire upon which he was at work, was obliged to climb through other wires, and the snaps of the belt, there being one on each side thereof, were apt to catch in the wires while the workman was going through them in climbing up and down the pole.   Without going into the testimony upon this subject, it is sufficient to say that there was proof, tending to show that the use of the belt by the deceased was not a necessity under the circumstances. It was a question for the jury to decide whether the failure to use such a belt showed negligence on the part of the deceased.   Some of the proof tends to show that, if deceased had had a belt, it would have been necessary to unhook it in climbing up and down the pole, and that the braces, which extended outward from the pole just above each cross-arm to the next arm above, would have prevented the slipping of the belt high enough to have enabled the deceased to have stood on the second cross-arm.

What has been said is also applicable to the question, whether or not the deceased was guilty of negligence in not using rubber gloves.   There is some proof, tending to show that there were rubber gloves in the wagon, in which the workmen rode, when they came to the point where the deceased and his companions were to do their work.   There is, however, proof tending to show that rubber gloves are used entirely in handling what are called *"live"* wires, that is,

wires with a current. The wires, which it was necessary for the deceased to handle in doing the work in which he was engaged, were not charged with any current, as we understand the testimony. In short, there is evidence tending to show that the use of rubber gloves by deceased in the work, which he was doing, would have been an inconvenience.

We are unable to say that there is no evidence, tending to show that the deceased was in the exercise of ordinary care for his own safety. The question, whether or not he was in the exercise of such care with reference to the failure to use the belt, or the gloves, or with reference to the position occupied by him while he was engaged in his work, was submitted to the jury by the instructions, asked by and given for, both parties.

*Third*—It is claimed by appellant that the court erred in giving to the jury the second instruction, which was given for the appellee, and which is as follows:

"The court instructs the jury that ordinary care, as mentioned in these instructions, is that degree of care which an ordinarily prudent person, *with deceased's knowledge or means of knowledge of electrical affairs,* and situated as deceased was, before and at the time of the accident, would exercise for his own safety."

The objection made to this instruction is, that it included the italicized words as above indicated. We concur in the following views expressed by the Appellate Court in their opinion, deciding this case, in reference to the instruction above quoted, to-wit: "The instruction obviously refers to the question of whether the deceased exercised ordinary care for his own safety. In our opinion the defendant was not prejudiced by the words complained of. The deceased was an experienced lineman and had been a foreman. Acts or conduct on his part might amount to or constitute negligence, when the same acts or conduct on the part of one wholly ignorant of electrical affairs would not amount to negligence. It was for the jury to find, from all the evi-

dence, what the deceased did, or failed to do, and then to say whether such acts and conduct showed ordinary care on his part for his own safety, or amounted to contributory negligence. This included as well the acts and conduct of the deceased in placing himself in the position in which he was, as his acts and conduct in that position, but we cannot see that the instruction is subject to the criticism, that it assumes that the deceased exercised ordinary care in placing himself in the position, in which he was at the time he fell."

The instruction could have worked no injury to the appellant, because the clause objected to imposed upon the deceased a higher degree of care than an ordinary person would be required to exercise under the same circumstances. The evidence shows that the deceased was, or should have been, versed in electrical affairs, and hence was charged with a knowledge of the dangers surrounding him greater than an ordinary person would be charged with.

In addition to this, the error in inserting the italicized words in the instruction, if there was error, was cured by the instructions which were given, inasmuch as from a consideration of all the instructions, regarded as one charge, the jury could not have been led into any error as to the degree of ordinary care, which the deceased was required to exercise. Instruction 1 given for the appellee and instructions 13, 17, 20, 6, 7 and 16 given for the appellant, all required that the deceased should exercise ordinary care for his own safety. Instruction 6, given for the appellant, told the jury that, if they believed from the evidence that it was dangerous for Rose to stand upon the strand or "messenger" cable, which made a perfect circuit between any charged electrical agency in the hand of Rose and the ground, and that Rose knew, or by the exercise of ordinary care, would have known, that standing upon said "messenger" cable was dangerous, and that a man of ordinary prudence, under such circumstances as surrounded Rose, would not have stood upon the said "messenger" strand or cable, while holding a telephone

wire suspended over electric light wires, then the jury should find the defendant not guilty. Instruction 7, given for appellant, told the jury that, if they believed from the evidence that a man of ordinary prudence, exercising ordinary care for his own safety under such circumstances as surrounded Rose at the time of this accident, would have worn and used a safety belt, and that Rose did not at the time of this accident wear a safety belt, and that Rose's death would have been prevented if he had worn a safety belt, then the jury must find the defendant not guilty. Instruction 16 given for the appellant told the jury that, if they believed from the evidence that Rose, before he went upon the cable east of Parnell avenue, had been warned that the wires were dangerous, and knew that said wires were dangerous, and that he, at the time he was upon the telephone pole, did not wear a safety belt to prevent himself from falling, and did not wear rubber gloves on his hands to prevent receiving a shock, and stood upon the "messenger" cable beneath the telephone wires without supporting himself with his hands, body or arms, and that a man of ordinary prudence under like circumstances would, if he had been warned of the dangerous character of the electric light wires, have had in use a safety belt, and would have worn rubber gloves, and would not have stood upon said "messenger" cable to perform the work deceased undertook to perform, without having some other support than deceased had, then Rose was guilty of contributory negligence and his administratrix could not recover a verdict in this case, provided such acts or omissions contributed to bringing about the accident.

*Fourth*—The action of the trial court in refusing to give certain instructions asked by the appellant is also criticised as being erroneous. Some of the refused instructions stated in substance that no recovery could be had under the ordinance heretofore referred to, or under the count based upon it. The declaration specifically set out *in hæc verba* the material portion of the ordinance, and also that the defendant

accepted the terms and conditions of the ordinance. The ordinance was introduced in evidence, and a written acceptance thereof, filed with the city, was also introduced in evidence; and it was also shown that the electric wires in question were operated under the ordinance.

The main objection, made by the appellant upon this branch of the case, is that the ordinance makes an act negligence, which, without the ordinance, would not be negligence. In other words, the claim is that the ordinance could not create a duty, and make the violation of that duty evidence of negligence. Where the ordinance is such an one as the city is authorized by its charter or by statute to pass, the violation of the ordinance is *prima facie* evidence of negligence. Under its charter the city of Chicago had the right to regulate the use of the streets, and to provide for the lighting of the same. (1 Starr & Curt. Ann. Stat.—2d ed.— p. 694). In addition to this, "the regulation and control of electric light companies in respect to their use of the streets, and the erection and construction of their appliances, is within the police power generally delegated by the State to municipal corporations." (10 Am. & Eng. Ency. of Law, —2d ed.—p. 863). "The specific duty, a violation of which is negligence in law, may also be created by statute or ordinance." (21 Am. & Eng. Ency. of Law,—2d ed.—p. 460). The ordinance here in question, having been passed in pursuance of a power conferred by statute, has the force and power of the statute. (*United States Brewing Co.* v. *Stoltenberg,* 211 Ill. 531, and authorities there referred to). Nor can it be said that the ordinance in question is indefinite and uncertain by reason of the use of the words, *"or other suitable mechanical device or devices."* Nor is there any delegation of power by the ordinance to a city representative to determine what are suitable mechanical devices. A statute, relating to fire escapes, which provided, among other things, that certain buildings "shall also be provided with one or more automatic metallic fire escapes, *or other. proper*

*device,"* and imposed upon the inspector of factories certain duties with reference to enforcing the same, has been sustained by this court. (*Arms* v. *Ayer,* 192 Ill. 601). See, also, to the same effect *McRickard* v. *Flint,* 114 N. Y. 222, and *Willy* v. *Mulledy,* 78 id. 310. The views, expressed in the *Ayer* and *Flint cases, supra,* apply here. Moreover, the proof shows that appellant accepted the ordinance without qualification, and availed itself of the benefits of the same, and, therefore, is now estopped from repudiating its conditions. (*Chicago General Railway Co.* v. *City of Chicago,* 176 Ill. 253; 21 Am. & Eng. Ency. of Law,—2d ed.— p. 979). We are of the opinion that the trial court committed no error in refusing the instructions upon this subject, or in refusing to exclude the ordinance.

The refusal of some other instructions is complained of, but they were erroneous as seeking to confine the attention of the jury to the absence of proper insulation alone without reference to the additional requirement of the ordinance as to the protection of the electric light wires by guard-wires, and as excluding from their consideration the receiving of the electric shock as a concurring cause of the deceased's fall.

*Fifth*—Complaint is also made on behalf of the appellant that counsel for appellee made improper remarks in his address to the jury. We discover nothing in the remarks so made, which transgressed the limits of legitimate argument. The remarks, alleged to have been improper, related to the acceptance of the ordinance by the appellant company, and the failure of that company to obey it after its acceptance. The inferences and argument in reference to the acceptance were, as we think, justified by the facts, and such facts were substantially undisputed. Other remarks, alleged to have been improper, were comments made by counsel upon the testimony and conduct of one of the appellant's witnesses. Counsel may arraign the conduct of the parties, and impugn, excuse, justify, or condemn motives, so far as they are developed in evidence, or assail the credibility of witnesses

214—36

when it is impeached by direct evidence, or by inconsistency, or incoherency of their testimony, their manner of testifying, their appearance upon the stand, or by circumstances. "He may argue such conclusions from the testimony as he pleases, provided he does not misquote witnesses." (2 Ency. of Pl. & Pr. p. 716). It has been said: "Just and fierce invective, when based upon the facts in evidence and all legitimate inferences therefrom, is not discountenanced by the courts." (2 id. p. 747).

For the reasons above stated, the judgment of the Appellate Court is affirmed.                    *Judgment affirmed.*

