210      APPELLATE COURTS OF ILLINOIS.

Kelly v. Com. Elec. Co., 167 Ill. App. 210.

# William J. Kelly, Appellee, v. Commonwealth Electric Company, Appellant.

## Gen. No. 16,092.

1. CONTRIBUTORY NEGLIGENCE—*when not, as a matter of law to fail to wear rubber gloves.* *Held,* under the evidence in this case that the question whether the plaintiff in failing to wear rubber gloves in handling dead electric wires was guilty of contributory negligence, was, notwithstanding such wires were being taken down immediately over live wires, a question of fact for the jury.

2. EVIDENCE—*what not improper in personal injury action.* In an action for injury from electric shock, *held,* that the following question to which the answer "No" was given, was not so improper as to affect a judgment for the plaintiff: "At the time that you took hold of the wire with your right hand and got the shock, or at any time before that, did you know that there was any current of electricity in that?"

3. EVIDENCE—*effect where cross-examination may remove prejudice.* Notwithstanding evidence may be improper if its baneful effect may be removed by cross-examination reversible error will rarely be held to have been committed.

4. INSTRUCTIONS—*how may be cured.* The incompleteness of one instruction may be supplied by the completeness of another.

5. VERDICTS—*when remittitur cures.* A *remittitur* will cure an excessive verdict if such verdict is not apparently the result of passion, prejudice or undue influence.

6. VERDICTS—*when not excessive.* A verdict reduced by remittitur to $7500 is not excessive where it appears that the plaintiff at the time of his injury was earning $3 per day and sustained as a result of his injury largely, if not entirely, the loss of the use of his right hand.

Action in case for personal injuries. Appeal from the Circuit Court of Cook county; the HON. JOHN A. GRAY, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1909. Affirmed. Opinion filed February 6, 1912. *Certiorari* denied by Supreme Court (making opinion final).

ROBERT J. SLATER, for appellant.

JOHN C. KING and JAMES D. POWER, for appellee.

MR. JUSTICE CLARK delivered the opinion of the court.

The appellee, hereinafter called the plaintiff, was a lineman in the employ of the appellant, hereinafter called the defendant, and on April 5, 1907, was injured while at work on a pole of the defendant by receiving an electric burn from a wire which he was engaged in handling.

There was a trial in the Circuit Court before the court and a jury, which resulted in a verdict for the plaintiff of $12,000. A motion for a new trial was denied upon the plaintiff's entering a *remittitur* of $4,500. Thereupon a judgment for $7,500 was rendered, from which judgment this appeal is taken.

We are asked to reverse the judgment, the grounds alleged being that the court erred in refusing to instruct the jury to find the defendant not guilty; that the verdict is against the manifest weight of the evidence; that the court erred in its rulings upon evidence; that there were errors in the instructions, and that the verdict is excessive.

The accident happened on a pole at the northwest corner of the intersection of Ashland avenue and the alley south of Chicago avenue, in the city of Chicago. The appellant had a line of poles, from 100 to 125 feet apart, located along the west side of Ashland avenue, a north and south street, and extending north from an alley in the block south of Grand avenue, crossing Grand avenue, Chicago avenue one half mile north of Grand avenue, Division street one half mile north of Chicago avenue, and ending at Baumann avenue, one quarter mile north of Division street. Grand avenue, Chicago avenue, Division street and Baumann avenue all run east and west, and intersect Ashland avenue. On each of these poles were two cross-arms, one above the other, extending east and west, the upper cross-arm being 20 or 22 inches above the lower. Each cross-arm was equipped with four pins ten inches apart on each side of the pole. Attached to the four pins west of the pole, on the

upper cross-arms, were four wires, forming a three-phase circuit, designated as circuit No. 59. This circuit consisted of one neutral or return wire, also spoken of as the "east" wire, attached to the first pin west of the pole, and three primary-phase wires, otherwise called simply "primary," "hot," "live" or "charged" wires, attached to the second, third and fourth pins west of the pole. These pins are also referred to as pins "1," "2," "3" and "4," from the west end of the cross-arm, pin "4" being the one to which the neutral was attached, next to the pole. Circuit No. 59 was fed from the south through a line of wires leading to it from the alley south of Grand avenue. The three primary-phase wires were also connected, at Division street, with and fed from the three primary-phase wires of another three-phase circuit, running east and west, along the north side of Division street, which in turn connected with an underground line west of Ashland avenue. This connection was made by means of short tap-wires.

Attached to the pins west of the pole on the lower cross-arm were two wires, forming a single-phase circuit, designated as circuit No. 11. This circuit consisted of one primary-phase wire, also called the "east" wire, attached to the first pin west of the pole, and one neutral wire attached to the second pin west of the pole. Circuit No. 11 was fed from an underground circuit, the two wires of which led up a pole, about 25 feet west of the line of poles above mentioned, in an alley running west from Ashland avenue, in the block immediately south of Chicago avenue, and extending east from that pole to one of the lines of poles on Ashland avenue, which stood at the northwest corner of the intersection of the alley and Ashland avenue, attached to the third and fourth pins west of the pole, tapped over to the first and second pins west of the pole, and connected with the wires of No. 11 circuit. These pins are also referred

to as pins "1," "2," "3," and "4," from the west end of the cross-arm, pin "4" being the one next to the pole, from which the primary of No. 11 circuit led north and south.

On the afternoon of the day before the accident the plaintiff, with others, working under the immediate direction of a foreman, Noak Johnson, was engaged in taking down wires of circuit No. 59, between Chicago avenue and Grand avenue. It was testified to that before starting in on the work the foreman, Noak Johnson, told the plaintiff and the other men working with him that these wires were "dead." The word "dead" as understood by the linemen meant that the wire was not charged with electricity; it did not mean that it was not grounded. All of the wires were not taken down in the afternoon, and on the following morning the plaintiff, between eight and nine o'clock, started to take down another one and received a shock which caused his injuries.

The contention of the appellant (the defendant below) is that the accident was caused by the plaintiff needlessly placing his right foot on the primary of No. 11 circuit, and at the same time holding in his right hand the east or neutral wire of No. 59 circuit, thereby creating either a complete circuit to ground from the primary-phase of No. 11 circuit through his body and the east wire of No. 59 circuit, as a neutral, or a short circuit between the primary-phase of No. 11 circuit and the east wire of No. 59 circuit, as a charged wire without ground, or in effect a primary wire. On the other hand, it is claimed by the plaintiff that in some way or other the wire on circuit No. 59 was charged with electricity through the negligence of the defendant, and that Kelly's foot never came in contact with the primary wire of circuit No. 11 until after the accident; that when the accident occurred he changed position, so that when he was found with his shoe in contact with

214        APPELLATE COURTS OF ILLINOIS.

Kelly v. Com. Elec. Co., 167 Ill. App. 210.

the wire of circuit No. 11 he was in a different posi-
tion than he was when the accident occurred. The
plaintiff testified that he was on the second cross-arm,
the lower one, on the west side of the pole; that he
thought he had one foot between the pins next to the
pole, and the other between the second and third from
the pole. He further testified that he did not make it
a practice to stand on hot wires that were running
along on that cross-arm, but kept pretty clear of them;
that he always kept clear of them. He said "I never
stand on a wire at all, because you are liable to break
it down, and if it is a hot wire you are liable to get
a shock."

It is claimed by the plaintiff to have been shown by
the testimony of one Aird, who was a sub-foreman of
the defendant and a witness for the plaintiff, that the
east wire of circuit No. 59 ran north from the scene of
the accident to a transformer; that in the transformer
it was in contact with another wire which in turn was
in contact with a primary wire on Division street, the
result being that the east wire was a live wire through-
out its entire length and so remained until it was cut
north of Kelly by another workman named Bradd
after the accident, which action on the part of Bradd
resulted in making it "dead" south of the cut. It is
admitted by the plaintiff that Aird testified that he
made a tap or connection between this wire and the
neutral wire of Division street circuit, but plaintiff
insisted that it did not become a dead wire, and in
the nature of things could not, for it still ran into
the transformer and was still in connection with the
primary wire of the Division street circuit, and noth-
ing was done to disconnect it.

It appears from the evidence that the defendant
furnished the plaintiff with rubber gloves, to use when
necessary, and that the plaintiff had a pair of these
gloves with him at the time of the accident. It was
further shown that it was not the custom to wear

rubber gloves when handling dead wires, presumably for the reason that they were inconvenient and the workmen could accomplish more without them.

It is further contended by the plaintiff that the negligence of the foreman, Johnson, is shown by his admission that after the wires of circuit No. 59 had been cut south of Grand avenue by his orders, he told the men that they were then "dead;" and by his further admission that at that time he knew that the cutting of the wires at that point would not make them dead unless a source of supply to the south which had thus been cut off was the only source of supply, and by the further admission that he at that time did not know whether the source of supply from the south was the only source.

In the case of Commonwealth Electric Co. v. Rose, 214 Ill. 545, the Supreme Court had before it a somewhat similar case. In that case it was charged that the plaintiff's intestate was negligent in not using a belt which might have prevented his falling to the ground, and also in not using rubber gloves. Mr. Justice Magruder, speaking for the court, after commenting upon the evidence in the case with respect to the non-use of the belt, continues as follows:

"What has been said is also applicable to the question, whether or not the deceased was guilty of negligence in not using rubber gloves. There is some proof, tending to show that there were rubber gloves in the wagon, in which the workmen rode, when they came to the point where the deceased and his companions were to do their work. There is, however, proof tending to show that rubber gloves are used entirely in handling what are called *"live"* wires, that is, wires with a current. The wires, which it was necessary for the deceased to handle in doing the work in which he was engaged, were not charged with any current, as we understand the testimony. In short, there is evidence tending to show that the use of rubber gloves by de-

ceased in the work, which he was doing, would have been an inconvenience.

"We are unable to say that there is no evidence tending to show that the deceased was in the exercise of ordinary care for his own safety. The question whether or not he was in the exercise of such care with reference to the failure to use the belt, or the gloves, or with reference to the position occupied by him while he was engaged in his work, was submitted to the jury by the instructions, asked by and given for both parties."

We think the language peculiarly applicable to the present case.

It is argued by the defendant that while, as a matter of law, it may not be contributory negligence not to wear rubber gloves in handling dead wires, yet under the circumstances in this case, when such wires were being taken down immediately over live wires, the fact that the plaintiff did not have on such gloves very strongly indicates a want of ordinary care on his part. While it might be admitted that such action of the plaintiff was indicative of the want of ordinary care, it would not, in our opinion, be conclusive proof in that regard. We think that the question was properly left for the jury to determine, and that the verdict should not be set aside, because it cannot be said to be against the manifest weight or preponderance of the evidence.

Complaint is made that the court erred in overruling objections to certain questions that were asked of the plaintiff at the hearing. On direct examination the plaintiff was asked the question, "Did you know there was any current in them then?", and answered, "I don't know; I thought they were dead." There was an objection to the question, which was overruled by the court and exception taken. No ground for this objection was given at the time.

The plaintiff was then asked: "At the time that

you took hold of the wire with your right hand and got the shock, or at any time before that, did you know that there was any current of electricity in that?" Objection was made that the question was leading and suggestive. The objection was overruled and the witness answered: "No."

The argument is made by counsel for defendant that the questions assumed the very fact in issue, namely, whether there was a current of electricity in the wire, and that framed as the questions were the jury would be very liable to understand from them that the plaintiff testified that there was a current in the wire, although he did not know it when he took hold of the wire. We do not think that the jury could have been misled by the questions or the answers. The plaintiff evidently assumed, and doubtless had the right to do so, that there was no current of electricity in the wire, because he had been told by the foreman that it was "dead." In any event the admission of the testimony, even if erroneously received, was not of such a character as should cause a reversal of the case.

The witness was asked the question, "Go on and tell us more particularly what was the matter with it" (referring to his hand), and answered, "All the tendon is gone from my wrist there." A motion to strike out the answer was denied. It is urged that the motion should have been granted and the answer stricken because the witness was not competent to testify as to the condition of the tendon, and because there was no other evidence on the trial showing injury to the plaintiff's wrist. The defendant had an opportunity to examine the witness as to his competency to testify in the matter, but did not do so, and we do not think that the action of the court in refusing to grant the motion should cause a reversal. We are unable ourselves to determine from the answer whether the witness referred to a tendon of the hand

218    APPELLATE COURTS OF ILLINOIS.

Kelly v. Com. Elec. Co., 167 Ill. App. 210.

from the wrist down, or a tendon of the wrist itself, and we are not aided in that regard by any cross-examination of the witness by the defendant.

Two instructions were tendered by the plaintiff and given by the court. These had to do with the elements of damage which should be considered by the jury if they found the issues for the plaintiff. The first instruction was apparently approved by the Supreme Court in North Chicago Street Ry. Co. v. Fitzgibbons, 180 Ill. 466, and Richardson v. Nelson, 221 Ill. 254. It appears to have been criticised in Keokuk Bridge Co. v. Wetzel, 228 Ill. 253, in that it should have been limited so as to apply only to the physical injury which was sustained.

While error is alleged by the defendant on account of the giving of the second instruction tendered by the plaintiff, the instruction is not criticised in the argument. In the closing part of the second instruction the jury were told in substance that if they found for the plaintiff their finding should be in such sum as, under the evidence and instructions of the court in the case, would be a fair compensation for the injuries the plaintiff sustained or would sustain, if any, "but only so far as such damages and injuries, if any, are claimed and alleged in the declaration and proved by the preponderance of the evidence." We think this portion of the second instruction overcame the criticism of the first instruction, as made in Keokuk Bridge Co. v. Wetzel, *supra.*

Twenty-four instructions were tendered by the defendant, seventeen of which were given, and seven refused. We think the instructions given as a whole properly advised the jury of the rules by which they should be governed in arriving at their verdict in the case. We have carefully considered the argument of counsel upon the seven instructions which were refused, and in our opinion the court did not err in refusing such instructions. Several of them were covered by

instructions given, and others were properly refused as having a tendency to mislead the jury.

The next point suggested by the defendant is that the damages are excessive. It is true that the trial judge thought the verdict of $12,000 too large, and required a *remittitur* of $4,500 therefrom. It is claimed by the defendant that the verdict can only be accounted for by passion, prejudice or misunderstanding on the part of the jury, and that the trial court must have so considered it in insisting upon so large a *remittitur*. In the case of Libby, McNeill & Libby v. Scherman, 146 Ill. 540, a judgment rendered for two-thirds of the amount of damages awarded by the jury, the court having required a *remittitur* of $2,500 from a verdict for $7,500, was sustained in this and the Supreme Court. We do not think the judgment in the present case should be reversed because of the amount. The plaintiff was in receipt of wages amounting to three dollars per day of eight hours, and testimony tends to indicate that he has largely, if not entirely, lost the use of his right hand.

We find no error in the record which should cause a reversal of the judgment, and it is therefore af-firmed.

*Judgment affirmed.*