OH BOY GROCERS, Plaintiff and Counterdefendant-Appellee, *v.* SOUTH EAST FOOD & LIQUOR, INC., Defendant and Counterplaintiff-Appellant.

First District (2nd Division)   No. 78-1572

Opinion filed December 4, 1979.

Law Offices of Robert J. Egan, of Chicago (Terrence R. Lyons and Candace B. Simning, of counsel), for appellant.

Holleb, Gerstein & Glass, Ltd., of Chicago (F. Alison Dodds, of counsel), for appellee.

Mr. JUSTICE HARTMAN delivered the opinion of the court:
In an action seeking reimbursement for a dishonored check tendered

as payment for goods by defendant, counterclaimant South East Food & Liquor, Inc. (hereinafter South East) which plaintiff, counterdefendant Oh Boy Grocers, a Division of Holleb & Co., Inc. (hereinafter "Oh Boy") alleges were delivered and accepted and which South East denied, the court sitting without a jury entered judgment for Oh Boy in the full amount of the dishonored check and entered judgment in favor of Oh Boy on South East's counterclaim, from which South East appeals.

South East raises five issues for review, including whether: it was given a fair and impartial trial; the findings were against the manifest weight of the evidence; closing arguments were proper; leave to present the counterclaim was properly denied; and leave to reopen the case was properly denied.

For reasons hereinafter stated the cause is affirmed in part and reversed in part and remanded for further proceedings.

Oh Boy is a wholesale grocery with offices at 3223 S. Western Avenue, Chicago, and a warehouse in Bensenville, Illinois. South East operated a retail food and liquor establishment at 6820 S. Stony Island Avenue in Chicago. On or about June 17, 1975, South East placed an order with Oh Boy for certain goods which were allegedly delivered to South East's store on June 20. The goods were unloaded under the supervision of Nayef Sweis, one of the owners of the store, with the assistance of some of his employees. One of the principal disputes in the facts arises at this point with respect to whether South East through Sweis refused the order and had the goods returned to the truck, or the goods remained in the store and the truck returned to the warehouse empty.

Oh Boy's truck driver, Ronald Serino, an employee of 17 years, testified that when he drove the goods to South East's establishment he was to receive two checks: one a certified check for an order previously delivered, and the other a check for the order then being delivered. Before unloading he received the certified check and then went to the rear of the store together with Samiah Sweis, Nayef's brother, and Nayef, and a few of South East's employees. It took five or six of them four hours to unload the truck. The two Sweis brothers counted the "pieces" as the truck was being unloaded, marking down every 25 items on a piece of paper. After the truck was unloaded, he presented the cargo manifest (invoice) which the store owner or his agent must sign stating that he received the amount of pieces shown. The Sweis brothers complained that they wanted merchandise that was marked "out" on the manifest and not delivered, although the tally sheet totaled by Nayef Sweis and his own tally sheet came to 868 pieces as set forth in the manifest. Nayef Sweis signed the manifest in his presence, and he then received a check signed by Samiah Sweis in payment of the delivery, in the amount of $7501.80, dated June 20, 1975, and payable to Oh Boy. Serino thereafter drove his

truck back to the warehouse in Bensenville and turned in the check together with his collection which went to the Oh Boy cashier.

On cross-examination Serino testified that everything charged and billed for on the manifest was delivered. Items which are not delivered are physically marked "out" on the invoice. When deliveries were made, a conveyor system consisting of 10′ roller sections was set up leading from the trailer going to the back room of the store, where the items or pieces were stored. Before the manifest or invoice and the check in payment thereof were signed, he had to call his office because the Sweis brothers would not sign a check or return the merchandise. His office instructed him to call the police, which he did. An unidentified sergeant and police officer arrived; however, the latter left. He showed the sergeant the goods in the store and the sergeant told the Sweis brothers either to pay him or let him take the goods out.

At this point in the proceedings, the parties stipulated that the check tendered in payment of the goods delivered on June 20 was returned unpaid and that no payment was ever received by Oh Boy for the delivery allegedly made. Oh Boy then rested its case. South East's motion to dismiss the case because Oh Boy had not established the delivery of the goods was denied.

Nayef Sweis was then called as a witness on behalf of South East. He testified that he was the owner of the store on June 20, 1975, and purchased groceries from Oh Boy. A delivery of goods was made that day by Oh Boy, and they were removed from the truck piece by piece. He counted the pieces being removed until he reached 625. Looking at the invoice he saw he was being charged with 868 pieces, but only eight or nine boxes were left on the truck when he reached the count of 625. He told the truck driver about the difference, who advised him to call the sales manager at Oh Boy, one Tony Mazzocchi, which he did. Mazzocchi told him to accept the order and whatever shortages were found would be replaced the next day, but Sweis refused. After the phone conversation he and the truck driver began checking the 600 pieces on the floor so that he could ascertain what was "short" on the order but after going through this procedure for a time, he could not complete it and he told the truck driver to put all of the items back on the truck and bring him the exact total pieces which he would then accept. He gave orders to his stock boys to return the goods into the truck, which they completed in his presence. He thereafter locked the back door to the store. He then went to his bank to put a stop on the certified check he had given the truck driver because Oh Boy still owed him merchandise which had not been delivered on the previous order. He called his brother Samiah and asked him to come to the store while he was gone. He did not sign a second check for Oh Boy, nor the manifest, nor did he accept the order or authorize anyone else to

sign a check in payment therefor. While he was gone from the store his brother was forced to write a check to Oh Boy under coercion by police.

On cross-examination he testified that he was the president of the corporate defendant at the time of the incident. His brother Samiah had been working for him at the store and, until May 30, 1975, had been authorized to sign checks. Samiah's authorization was cancelled after that date and Oh Boy was notified of that fact. Samiah did in fact sign checks on two or more occasions between May 30 and June 20, but not after that date. Although he knew that the order for which the first certified check was given had been short, he nevertheless paid Oh Boy the full amount of the order. He denied having seen his brother sign the check in payment for the goods delivered on June 20. The Oh Boy truck drove away that day as full as it had been when it arrived, everything having been put back into the truck and no boxes having been opened or merchandise taken out of the boxes and put on the shelves in his store.

South East called Samiah Sweis as a witness, who testified that on June 20, 1975, he came down to the store at the telephone request of his brother, who then left to go to the bank. Serino was at the store at the time. A police sergeant thereafter came and told him to sign a check, at which time he was pointing his pistol. The sergeant said "you have to give him the check now," although he asked to wait until his brother came. Half the goods that had been delivered were in the back of the store, and the other half were back in the truck. He signed both the check and the manifest because the policeman told him to sign them, although he did not know whether or not the order had been delivered or was complete. He was not authorized to sign checks for the store at that time.

On cross-examination he testified that the policeman threatened him in the way he talked. At the time the policeman came there were men in the store unloading boxes and shelving merchandise, but not the new stock, only that which had been previously delivered to the store. Serino did not threaten him, and the police officer did not say that he would be arrested if he failed to comply. The policeman held his hand on his pistol when he spoke to him.

On redirect examination he testified that the goods were removed from the store and pushed outside to the truck in the alley. Some 10 or 15 pieces were lying in the alley near the truck when he looked in back, but nothing was left in the back of the store when Serino departed. His brother was not back at the time the truck driver left the store. He signed both the manifest and the check, although the signature that he used was different on the check because he signed it under duress. The merchandise had already been placed in the truck at the time he gave the check to Serino.

Alexander Price was called as a witness by South East and testified that he worked for South East from time to time. He was asked to help unload the truck containing canned goods and boxes on June 20. As the goods were unloaded, the boss of the store began counting until a misunderstanding between him and the driver developed and Price and others helping were later instructed to return the goods to the truck, which they did. Everything they took off they put back on. On cross-examination he testified that he was not a regular employee but lived near the store, of which he was also a regular patron. He was on social security disability. He could not remember the color of the truck or the name on its side, having seen only its back end. A month before the trial he was contacted by Nayef Sweis who "* * *" refreshed my memory about the truck and load and the misunderstanding having to reload," but he later denied having had his recollection refreshed as to the reloading of the truck.

Woodroe Knowlin, then currently unemployed, testified for South East that he occasionally worked for it, including June 20, 1975. He went by there every day and helped unload the trucks. "Sam" asked him to help unload the trucks on the day in question. The person he identified in court as "Sam" was actually Nayef Sweis. He and others unloaded the boxes until there seemed to have been a shortage. They were then told to reload the boxes. On cross-examination he testified that he had worked for South East dozens of times. He had been laid off from his regular seasonal employment for about one month at the time he was called to help unload the truck on June 20, 1975. He was there when the police arrived but was in the back. He did not see a policeman with his hand on a gun. Three policemen were present. All the boxes that were taken off the truck were loaded back on. The defense rested after Knowlin's testimony.

On rebuttal, Serino, Oh Boy's truck driver, restated that the truck had been unloaded at defendant's store; he received a check from Samiah Sweis; and he then left. When he drove off for Bensenville, the only objects on his truck were empty pallets, conveyors and a hand-truck; there were no goods on the truck, all having been left in the store. When he would return to Bensenville, anything left on the truck by way of goods and merchandise would be checked by the warehouse foreman or superintendent. Stickers would be taken off the cases of returned merchandise and put on the back of the manifest, which was later forwarded to the office for use as a reference to give credit to the store owner. On June 20 there was nothing on his truck from which to remove stickers. He had no other stops to make that day. On cross-examination he testified that he knew of no previous occasion when employees of defendant refused to sign a check for a delivery. When the check was

signed by Samiah, Nayef was present, trying to stop payment on the certified check he was previously given. Nayef saw Samiah sign the check and deliver it to him, after which time the police arrived.

Tony Mazzocchi testified on rebuttal that he was Oh Boy's sales manager for almost two years, and occupied that position on June 20, 1975. He knew Nayef Sweis personally and called him on June 20, 1975, after being informed that there was a problem at the store. Sweis told him at that time, "I am not paying for the order. I am not returning the merchandise. It is not the order that I wanted originally," and then hung up on him. He was unable to get Sweis back on the telephone. Sweis complained that he had placed a bigger order than was shipped. Two or three days earlier, the order given by Sweis was in the amount of $10,000. Oh Boy already had one "NSF" check from Sweis and would not ship an order larger than the amount of the "NSF" check. A certified check at the time of delivery was required. Sweis had then agreed to have the order cut down. He was never notified that Samiah Sweis could no longer sign checks on behalf of the corporation. During the conversation of June 20, Nayef Sweis did not complain to him that the order was short the number of boxes that appeared on the manifest or invoice; Sweis only told him the order delivered was not the order he put through.

Morton C. Holleb, Oh Boy's officer and credit manager, testified on rebuttal that his duties included general accounting and credit functions, handling of insufficient funds and other bank accounts and closed checks. Oh Boy Grocers are on a computer system in which inventory control is maintained over merchandise in the warehouse. When a driver returns with goods still in the truck after he comes back from the day's delivery, and if those goods are to be reshipped on a subsequent day, there is no reflection on the computer; but if the goods are to be returned they will be added into the inventory by paperwork and physical handling, and the computer is readjusted to reflect the change. He was aware of the events of June 20, 1975, but saw no reflection of any return of merchandise with respect to South East on the computer or other paperwork. He received a check from his cashier that day issued by South East which was run through the bank and returned "account closed." On cross-examination he testified that a driver is always checked in when his truck returns to the warehouse and the truck would either be locked or the goods removed from the truck, depending on what was to be reshipped.

Marshall Stith, sales supervisor employed by Oh Boy for 12 years, testified as a rebuttal witness that South East's store was within his district in June of 1975. He knew both Nayef and Samiah Sweis. No one from South East ever told him that Samiah Sweis was no longer authorized to sign checks. Tony Mazzocchi asked him to cut down the June 20 order somewhat so that it would be brought within South East's financial reach. On cross-examination, he testified that cutting back an order like that was

done without consultation with the store owner. He was not familiar with any previous occasion when defendant refused to pay for any goods delivered.

Following closing argument, the trial court found the issues in Oh Boy's favor in the amount of $7501.80. The court then asked whether there was any counterclaim, to which defense counsel replied in the affirmative. Although Oh Boy moved that the counterclaim be dismissed, the court entered judgment on the counterclaim in favor of Oh Boy and against South East. South East's motion for leave to reopen the case with regard to the counterclaim was thereafter denied. This appeal followed.

South East contends that the judgment of the trial court was contrary to the manifest weight of the evidence based upon conflicts in the testimony of witnesses. It argues that because the only testimony in Oh Boy's behalf as to who signed the manifest came from its employee, Serino, and the police sergeant was not called by Oh Boy to verify Serino's version of the facts, his testimony lacks credibility, which South East claims for its own witnesses, particularly the Sweis brothers. No representations were made by either party with respect to the availability of the police sergeant; from all that appears, he was as readily available to South East as he was to Oh Boy to support their relative perspectives of the facts. The trial judge had the duty of resolving the conflict in testimony and, having seen the witnesses and having heard the evidence, is in the best position to determine their credibility. (*Smith v. Realcoa Construction Co.* (1973), 13 Ill. App. 3d 254, 300 N.E.2d 855; *General Casualty Co. v. Elam* (1972), 8 Ill. App. 3d 215, 289 N.E.2d 699.) We cannot say from the evidence that the trial court's finding with respect to the credibility to be accorded the testimony of Serino in contrast to the versions given by the Sweis brothers is against the manifest weight of the evidence.

■■■ Serino testified and Samiah Sweis confirmed that the latter signed the check in question. The presence or absence of a police officer to confirm or deny this signing would have been cumulative. In admitting that he signed the check, however, Samiah Sweis claims that it was done under coercion of the police sergeant either in his pointing his pistol, or holding his pistol, or speaking in a coercive tone of voice. The defense of duress in signing the instrument was one which South East was required to affirmatively plead and prove under section 43(4) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 43(4), not the burden of plaintiff of disproving its existence. Other evidence adduced by South East in this regard consisted of Alexander Price's version. He was one of the occasional stock men employed by South East who recalled seeing three policemen on the scene but saw no one with a hand on his gun. The trial court could properly find under these circumstances, as it did, that the

defense raised with respect to the authenticity of the check was insufficient. Further, the lack of authority in Samiah Sweis to sign such a check was also an affirmative defense under section 43(4). In this respect the evidence was again conflicting. Nayef Sweis testified that Samiah did not have the authority to sign checks after May 30, 1975, notifying Oh Boy to that effect. Oh Boy's employees denied having ever received such notification. Moreover, Nayef Sweis admitted that Samiah had indeed signed one or more other checks in the period of time after which his authority had allegedly been withdrawn. His alleged want of authority does not explain why the check was returned marked "account closed." Under this state of proof, the trial court could have properly deemed it to have failed to maintain a viable defense under this theory.

■■ South East insists that because it produced four eyewitnesses who testified that Oh Boy's truck left its store loaded with the rejected merchandise, as opposed to only the testimony of the truck driver Serino to the contrary, the trial court had no right to find the issues in Oh Boy's favor. Serino's testimony was verified by Mazzocchi, who had stated that in a telephone conversation with Nayef Sweis during the incident, the latter said, "I am not paying for the order. I am not returning the merchandise," based upon the refusal of Oh Boy to ship the entire amount of the order originally given, not upon his being charged for items which were not in fact shipped. Testimony given by the four witnesses on behalf of South East contained internal inconsistencies sufficient for the trial court to assess the evidence against it. For example, Nayef Sweis testified that all the goods were put back on the truck while he was there; after the goods were reloaded he called Samiah to watch the store and he then went to the bank. Samiah's version was that when he arrived at the store, half the goods were in the truck and the other half were not. Further, the testimony of Price and Knowlin that the truck allegedly was as fully loaded when it left as when it came in was also disputed by that given by Samiah, who claimed to have seen 10 or 15 pieces left lying in the alley. South East suggests that the Sweis brothers, having been recent arrivals to this country, had difficulty in understanding questions and in expressing themselves in response to the questions. If this was so, it was incumbent upon defense counsel to secure the services of an interpreter so that the testimony given by the brothers was properly communicated to the court without the asserted difficulty.

■■ South East suggests that the truck driver could have stopped at other places on his way back to the warehouse and disposed of the goods which had been reloaded on his truck. Nothing in the record supports this theory. To the contrary, the only testimony relative to the driver's post-delivery activities was that of Serino himself, who testified that he went directly from the store to the Bensenville warehouse without any further stops. The fact that Serino referred to a "collection" given to the

Bensenville warehouse cashier could simply have referred to the fact that two checks were received by Serino from the Sweis brothers, a certified check and the one that subsequently became the subject matter of this lawsuit. In consideration of the evidence in its entirety, we cannot say that the trial court's judgment was based upon doubtful, unsatisfactory or improbable evidence, or was clearly insufficient, even though the evidence regarding material facts is conflicting or irreconcilable, nor can we substitute our judgment for that of the trial court under such circumstances. There is, therefore, no basis upon which to disturb the judgment appealed from. *Salem National Bank v. Chapman* (1978), 64 Ill. App. 3d 625, 628, 381 N.E.2d 741; *Saad v. South Side Bank* (1978), 62 Ill. App. 3d 493, 497, 379 N.E.2d 46.

■■ South East urges that improper closing argument to the court by counsel for Oh Boy, that the witnesses produced by South East were "lying in the most grotesque way," although Oh Boy never impeached the testimony of any of said witnesses, prejudiced its case. The statement actually made was that "somebody is lying and I mean lying in the most grotesque way." Counsel must be given latitude within which to draw conclusions from testimony given and any disparity which may be found in the evidence. As was stated by the appellate court in *Illinois Building Authority v. Dembinsky* (1968), 101 Ill. App. 2d 59, 67-68, 242 N.E.2d 67, quoting from *Commonwealth Electric Co. v. Rose* (1905), 214 Ill. 545, 73 N.E. 780:

> " 'Counsel may arraign the conduct of the parties, and impugn, excuse, justify, or condemn motives, so far as they are developed in evidence, or assail the credibility of witnesses when it is impeached by direct evidence, or by inconsistency, or incoherency of their testimony, their manner of testifying, their appearance upon the stand, or by circumstances. "He may argue such conclusions from the testimony as he pleases, provided he does not misquote witnesses." (2 Ency of Pl & Pr p 716). It has been said: "Just and fierce invective, when based upon the facts in evidence and all legitimate inferences therefrom, is not discountenanced by the courts." (2 id. p 747).' "

Comments of counsel in this instance were well within the limitations prescribed above.

■■ ■ South East contends that the trial court failed to conduct the trial in a fair and impartial manner and became exasperated and irritated with the responses from Nayef and Samiah Sweis. We are referred to five incidents from which South East seeks to infer bias or prejudice against it. We have carefully examined the trial transcript and find that the complaint raised by South East borders on the frivolous. The trial judge bears a responsibility to conduct the proceedings consistently with the orderly administration of law and justice. In doing so the court may well direct a

witness to limit his answers to the questions asked, or may ask questions of his own on a limited basis intended to establish a better understanding of the facts, or may decline to permit a witness himself to conduct the examination in part while testifying from the stand, or may preclude a previous witness who has concluded his testimony from volunteering to answer a question put to a succeeding witness then on the stand. Such actions by the court are the bases of the complaints made by South East; we find the assignment of reversible error to be totally without merit. To be noted in passing is the fact that on occasion counsel for South East was himself constrained to admonish his witness to answer "just one thing at a time," to "just relax," and to "just answer the question," which appears to indicate that the difficulties with the witness of which complaint is made were shared in common by court and counsel.

■ South East points to the fact that the trial court asked Serino a series of questions when he testified on rebuttal and correctly asserts that to do so was improper. Only rare and exceptional instances and conditions justify the conducting of extensive examinations of witnesses by a trial judge. (*Goshey v. Dunlap* (1973), 16 Ill. App. 3d 29, 31, 305 N.E.2d 648.) The trial court in the instant case exceeded the permissible limits of inquiry in the series to which we have referred. Our examination of these questions and answers reveals, however, that no material or substantive information was developed through the court's questioning of this witness beyond that which had already been elicited by counsel for Oh Boy both on rebuttal and in the direct testimony. From the foregoing we cannot conclude that the court's conduct requires the cause to be reversed.

■ With respect to the appeal from the judgment for Oh Boy on the counterclaim filed by South East, Oh Boy suggests that the order granting judgment in its case is the only order designated in the notice of appeal filed by South East, although a separate order was entered with respect to South East's counterclaim which is not mentioned in the notice of appeal. Consequently, Oh Boy argues, under Supreme Court Rule 303(c)(2) (Ill. Rev. Stat. 1977, ch. 110A, par. 303(c)(2)), which requires specification of the judgment being appealed, the appellate court is precluded from considering errors assigned with respect to the denial of leave to present its counterclaim and of the motion to reopen the case in order to present it. The half sheet entry on May 10, 1978, shows a finding in favor of Oh Boy and against Nayef and Samiah Sweis individually in the amount of $7501.80 as well as a finding for Oh Boy on the counterclaim. An agreed order was subsequently entered on June 14, 1978, noting that under previous orders of court the individual defendants Nayef Sweis and Samiah Sweis were dismissed and defendant S.E. Food & Liquor Corp., an Illinois corporation, was duly substituted so that the judgment entered in plaintiff's favor on May 10, 1978, in the amount of $7501.80 plus costs

would be vacated and judgment entered in favor of plaintiff against defendant S.E. Food & Liquor Corp. in that amount and that the judgment with respect to the counterclaim was entered in favor of counterdefendant and against counterclaimant, *nunc pro tunc* as of May 10, 1978. The notice of appeal designates the order of May 10, 1978, as that from which the appeal was being taken. A notice which states that an appeal is being taken from a judgment entered on a certain date is sufficient as an appeal from the entire judgment and not just a portion thereof. (*Department of Transportation v. Galley* (1973), 12 Ill. App. 3d 1072, 1075, 299 N.E.2d 810; *City of Peoria v. Lynn* (1976), 44 Ill. App. 3d 697, 358 N.E.2d 718.) We find the notice of appeal sufficient and will not consider the counterclaim issue on its merits.

■■ The counterclaim was filed on May 30, 1976, to which Oh Boy filed its answer on November 10, 1976. At trial counsel for South East stood ready to offer evidence in support thereof. The reason given by the trial court for refusing to hear further evidence was that it had already heard final argument in the case. Having been informed in opening statements that a counterclaim was to be presented and having asked, after Oh Boy closed its case on rebuttal, whether there were any counterclaims to be presented, the trial judge was well aware that it had not heard or disposed of all of the controversies that existed between the parties. Section 44(2) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 44(2)) provides that the court in its discretion may order separate trials of any causes of action which cannot be conveniently disposed of with the other issues in the case. None of the evidence previously presented by either side related to the only counterclaim remaining, namely, whether Oh Boy had agreed to financially subsidize the expenditure by South East of monies to install an advertising sign on its premises. Refusing to permit evidence relating to this issue because he had heard final argument in the case-in-chief would result in a substantial injustice with respect to permitting South East to have its day in court on this claim and must be deemed an abuse of discretion requiring reversal of the cause only as to this aspect of the case. In this posture of the case, we need not consider the contention made by South East that it should have been permitted to reopen the case for the purpose of presenting its counterclaim.

For the foregoing reasons judgment for Oh Boy on its complaint against South East is affirmed and judgment for Oh Boy on the counterclaim of South East will be reversed and remanded for further proceedings not inconsistent with the views herein expressed.

Affirmed in part, reversed in part and remanded.

STAMOS, P. J., and DOWNING, J., concur.