CLEVELAND WRECKING COMPANY, Plaintiff-Appellee and Cross-Appellant, v. CENTRAL NATIONAL BANK IN CHICAGO, as Trustee, *et al.,* Defendants-Appellants and Cross-Appellees.

First District (5th Division) Nos. 1—88—0826, 1—88—1281 cons.

Opinion filed June 28, 1991.

Brydges, Riseborough, Morris, Franke & Miller, of Chicago (Thomas A. Morris, Jr., and Thomas Gerling, of counsel), for appellants.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith, Gary W. Leydig, and Robert G. Black, of counsel), for appellee.

JUSTICE McNULTY delivered the opinion of the court:

On January 20, 1981, a contract was finalized between Cleveland Wrecking Company (Cleveland) and Contractors and Engineers, Inc. (C&E), in which Cleveland agreed to perform demolition and strip-out work on the Sheridan Plaza Apartments (Sheridan Plaza). While the contract identified the owner of the Sheridan Plaza project as the Egidi Group, title to the real property was in the name of Central National Bank, with beneficial ownership in Sheridan Plaza Associates, a limited partnership whose general partners were Mario, Robert, Kenneth and Dennis Egidi. All of the Egidis were also officers of C&E.

Sheridan Plaza, the subject of the demolition contract, was a 12-story building formerly used as a hotel. Its physical configuration was in the shape of a "U" with the opening facing south. Within the opening of the U-shaped area was a 2½-story lobby. Connected to the east side of the main structure was a 2½-story ballroom running north about two-thirds of the length of the main structure. The exterior walls of the southern facades of the lobby and ballroom were covered by terra cotta tiles. Extending out from the northeast one-third of the main building, and to the north of the ballroom, was a 12-story wing, topped by 13th- and 14th-floor penthouses.

The contract for demolition work called for: strip-out and demolition of the 12-story wing and the 13th- and 14th-floor penthouses; re-

moval of the roof over the lobby of the main building; and demolition of the entire 2½-story ballroom, including the front wall and terra cotta facade. The strip-out and demolition work was preparatory to the owners' plans to completely renovate and rehabilitate the remaining structure and to build a new structure in the former location of the ballroom and multistory wing.

While the contract specified no completion date, it indicated "time is of the essence." The parties agreed when the contract was entered into that Cleveland's work should be completed in mid-June 1981. However, delays pushed Cleveland's demolition into July of 1981, when a general strike of operating engineers in the Chicago area caused it to halt all activity on the project. That strike ran until mid-September of 1981, at which time Cleveland was able to resume operations. Cleveland completed its job and left the Sheridan Plaza project on December 11, 1981.

In February of 1982, Cleveland filed a lien claim with the recorder of deeds against both C&E and the Egidi Group's interests in the Sheridan Plaza building property. Cleveland later filed a complaint to foreclose the mechanic's lien and for other relief against C&E, the Egidi Group, Mario, Kenneth, Dennis and Robert Egidi individually, the Sheridan Plaza Associates, and other defendants associated with the project or who claimed to have an interest in the property.

On January 15, 1988, following a four-week bench trial, the trial court found that Cleveland had perfected its lien rights on the Sheridan Plaza property and was entitled to a mechanic's lien in the amount of $354,411.48 (which constituted damages flowing from C&E's delays on the job as well as extras and the unpaid balance due Cleveland under the original contract), plus 5% annually. It further ordered that Cleveland was entitled to a judgment in the same amount under count II of its amended complaint (the breach of contract count), plus costs.

On February 4, 1988, the court entered a judgment of foreclosure and sale specifically adopting the findings of fact of the January 15 opinion and order. The court's judgment order found C&E alone indebted to Cleveland in the amount of $460,007.67, representing a principal balance of $354,441.48 and interest at the rate of 5% *per annum* beginning January 11, 1982. The court also found in favor of Cleveland on the defendant's counterclaim for damages. It further denied Cleveland's subsequent motion for entry of judgment as against all additional named defendants.

C&E appeals from the February 4, 1988, judgment of foreclosure and sale and from the denial of its counterclaim against Cleveland.

C&E also appeals the trial court's denial of its motion to dismiss count I of Cleveland's complaint. Cleveland appeals the denial of its post-trial motion to include all additional named defendants in the entry of judgment.

OPINION

I

In its appeal of the judgment of foreclosure and sale, C&E argues among other matters that Cleveland's demolition work did not constitute a lienable activity under the Illinois Mechanics' Liens Act (Ill. Rev. Stat. 1981, ch. 82, par. 1 *et seq.*). Cleveland contends that this issue has not been preserved for review, and that even if it has, case law and a liberal construction of the statute require this court to affirm the trial court's finding that Cleveland's work was lienable activity under the Mechanics' Liens Act.

Cleveland asserts that C&E has not preserved its lienability claim for review based on the following procedural history: On August 9, 1982, C&E filed a motion to strike count I of Cleveland's original complaint, arguing not only that Cleveland's lien claim failed to meet the requirements of section 1 of the Mechanics' Liens Act, but also that the claim for extras was substantially deficient as it failed to allege that such extras were ordered or approved by defendants. On October 19, 1982, the trial court denied the defendants' motion to dismiss, though giving Cleveland leave to file an amended complaint. Cleveland filed an amended complaint, curing only the defects as to the extras issue. C&E answered, but never renewed its motion to strike. Cleveland therefore asserts that any objection to the denial of the motion to strike is waived on appeal.

In support of this argument, Cleveland cites *Decatur Memorial Hospital v. West Lincoln Township* (1976), 38 Ill. App. 3d 356, 347 N.E.2d 804. In *Decatur,* plaintiff filed an original and an amended complaint. The amended complaint cured the defect contained in the original. Defendant then appealed its motion to strike the original pleading. The reviewing court found that the issue raised by defendant was not properly before the court, as the pleading against which the motion to dismiss was directed had been superseded by amendment. The original motion to dismiss could not therefore be used to test the subsequent pleading; it was only valid as to the original. *Decatur,* 38 Ill. App. 3d 356, 347 N.E.2d 804.

The case at bar, like *Decatur,* contains a complaint, an amended complaint, a motion to strike the original complaint, and an appeal of

the denial of the motion to strike. There the similarity ends. While the appealed motion to strike in *Decatur* involved a defect which had been subsequently cured, the present appeal does not. In the case at bar, the amended complaint did not revise or "cure" the original as to the grounds alleged in the motion to strike (the lienability of demolition work). Rather it cured the original as to its demand for extras. Thus, the original and amended complaints remain identical as to the grounds asserted in the motion to strike, making the reasoning in *Decatur* inapplicable.

■ Cleveland's claim that C&E has waived its objection to the denial of its motion to strike by failing to renew such objection following the amended complaint is not supported by case law. In fact, to require a defendant to renew an objection to a pleading which had not been revised would be duplicative and a waste of the court's time.

Assuming, *arguendo,* that the lienability issue has been preserved for review, C&E contends that the Mechanics' Liens Act and the case law interpreting it do not support the trial judge's finding that the demolition work and debris removal performed by Cleveland was lienable activity.

The Mechanics' Liens Act (Ill. Rev. Stat. 1981, ch. 82, par. 1) provides in relevant part that a lien shall be provided to:

> "Any person who shall by any contract or contracts \*\*\* with the owner of a lot or tract of land \*\*\* to improve the lot or tract of land \*\*\* for the purpose of \*\*\* building, altering, repairing or ornamenting any house or other building \*\*\* or raise or lower any house thereon or remove any house thereto, *or remove any house or other structure therefrom* \*\*\*." (The italicized language was added by amendment in 1980.)

Case law has recognized that the basis for such a lien is the performance of work or the furnishing of materials which constitutes an improvement on the land. (See *Robinette v. The Servite Fathers* (1977), 49 Ill. App. 3d 585, 587, 364 N.E.2d 679.) The focus of the inquiry to determine whether a mechanic's lien should be granted is whether the work performed has enhanced the value of the land to be charged with the lien. *D.M. Foley Co. v. North West Savings & Loan Association* (1984), 122 Ill. App. 3d 411, 461 N.E.2d 500.

The overall intent of the contract between Cleveland and C&E was to prepare the Sheridan Road property for the completion of new construction work. For this purpose Cleveland was to use its expertise to strip out and demolish all existing structures which stood in the way of new construction. The demolition work was thus an integral part of the new construction. Relying on these facts, the trial

judge found that Cleveland's demolition work constituted a permanent improvement on the Sheridan Road property, and thus, was properly lienable.

In spite of the uncontroverted fact that Cleveland's wrecking constituted an improvement on the land, thus ostensibly bringing it within the purview of the Mechanics' Liens Act, C&E argues that case law, specifically *Robinette v. The Servite Fathers* (1977), 49 Ill. App. 3d 585, 364 N.E.2d 679, does not support such a finding. In this case, the plaintiff contracted to haul away debris after full demolition of a building by another party. The *Robinette* court found that the plaintiff was not entitled to a mechanic's lien for merely hauling away debris. This court went on to state that hauling and demolition are not lienable activities as they do not fall within the express language of the relied-upon statute. *Robinette,* 49 Ill. App. 3d 585, 364 N.E.2d 679.

Cleveland contends that the *Robinette* decision should not control the outcome of the instant action as the ruling was overbroad and the language concerning demolition work was merely *dicta.* While Cleveland is correct that *Robinette's* language concerning demolition is *dicta* (since such a finding was not necessary to the outcome of that case), this court may still consider and rely on such *dicta* if it finds this reasoning persuasive.

Cleveland further discredits any reliance on *Robinette* as this decision not only involved a different version of the Mechanics' Liens Act, but is factually distinguishable from the case at bar. *Robinette* was decided under the 1973 version of the Mechanics' Liens Act (Ill. Rev. Stat. 1973, ch. 82, par. 1), while the instant action involves the amended 1981 statute, which added the phrase "or remove any house or other structure therefrom." Cleveland asserts that the new language expressly makes lienable what the *Robinette* court had found was not. The validity of this argument is apparent when the controverted phrases are compared. While the 1973 statute restricted coverage to raising or lowering any house thereon or removing any house thereto, the 1981 version expanded coverage to any house "or other structure" and included removing "therefrom" as well as the previous removing "thereto." Certainly Cleveland's demolition and hauling away of debris is encompassed by the "removing other structure therefrom" language. Although C&E argues that both versions of the statute should be similarly construed as both employ the same verb, "remove," what it neglects to note is that the corresponding sections of the statute employ different adverbs, namely "thereto" and "therefrom," which substantially change the meaning of their common verb.

■ Furthermore, as noted by Cleveland, *Robinette* is factually distinguishable from the case at bar. The *Robinette* plaintiff merely removed debris from a building someone else had demolished. Cleveland, on the other hand, contracted to strip out and demolish certain structures in order to make way for new construction. Cleveland's work, unlike that of the *Robinette* plaintiff, was an integral part of an overall plan to improve the land, and thus, should be considered lienable activity under the Mechanics' Liens Act.

C&E also argues that even if Cleveland's demolition work constitutes lienable activity, its removal of debris does not. C&E maintains that since the contract in question specified a lump sum for both types of work, the activities are inseparable and nonlienable. Illinois case law does support the proposition that where a lump sum contract includes both lienable and nonlienable work, and such items cannot be separated, the entire lien must fail. (*Adler v. World's Pastime Exposition Co.* (1888), 126 Ill. 373, 18 N.E. 809; *Flader Plumbing & Heating Co. v. Callas* (1988), 171 Ill. App. 3d 74, 524 N.E.2d 1097.) What C&E fails to note about the above-mentioned cases is that both involve clearly demarcated lienable and nonlienable activities. *Adler* involved the nonlienable activities of keeping books, auditing accounts, and making settlements with various contractors. (*Adler*, 126 Ill. 373, 18 N.E. 809.) *Flader* concerned a plumber who admitted that certain items in his lien claim, such as plugged gas lines and connected water lines, were not lienable. (*Flader*, 171 Ill. App. 3d 74, 524 N.E.2d 1097.) The activities in the case at bar are not so clearly delineated as lienable and nonlienable. Rather, a liberal construction of the statute, considering its remedial purpose, leads to a finding that both are indeed lienable.

■ Furthermore, the demolition and debris removal as performed by Cleveland Wrecking are inseparable and interdependent activities, for without the demolition work there would be no debris to remove, and without the removal of the demolition debris the value of the property would not be enhanced. In *Verplank Concrete & Supply v. Marsh* (1976), 40 Ill. App. 3d 742, 353 N.E.2d 27 (a case cited by C&E to support the proposition that a lien must fail if lienable and nonlienable activities are combined), the appellate court held that even though truck rental is a nonlienable activity (since the concrete could not be mixed without the trucks), to deny plaintiff's lien claim for concrete and truck rental would be to elevate form over substance and not in any way advance the purposes of the Mechanics' Liens Act.

■ C&E additionally contends that the Mechanics' Liens Act must be strictly construed as it created rights in derogation of com-

mon law. However, as Cleveland notes, Illinois courts have applied the rules of strict construction only as to the technical, procedural requirements of the Act. See *Du Page Bank & Trust Co. v. Du Page Bank & Trust Co.* (1984), 122 Ill. App. 3d 1015, 462 N.E.2d 25; *Armco Steel Corp v. La Salle National Bank* (1975), 31 Ill. App. 3d 695, 335 N.E.2d 93.

For the above-mentioned reasons, we find that Cleveland's work constituted lienable activity within the meaning of the Mechanics' Liens Act.

## II

On appeal C&E also asserts that Cleveland, and not C&E and the owners, is responsible for project delays and resulting damages. The delays at issue relate to C&E's changed decision regarding retention of the front ballroom wall (and Cleveland's corresponding stoppage of work until a written change order was forthcoming) and its failure to timely install column 14A, a major support structure, the presence of which was integral to the demolition of the multistory wing.

In 1980, when Cleveland entered into the demolition contract with C&E, it developed a sequencing methodology for the job. This plan called for work to commence with the strip-out operations. Next, Cleveland was to totally demolish the 2½-story ballroom. Although the original plan called for the entire ballroom to come down, the owners planned to save pieces of the terra cotta facade from the front wall. A third party would salvage the terra cotta for the owners ahead of time, after which Cleveland would initiate its demolition of the ballroom. On March 23, 1981, after the contract had been executed and the strip-out work had begun, Cleveland received formal notice from C&E that the entire front wall was to remain. Cleveland tried to obtain a written change order from C&E acknowledging the change in work as well as additional compensation. When none was forthcoming, Cleveland refused to proceed.

■■ C&E argues that the change at issue was within the general scope of the contract, and that Cleveland was bound by article 12 of the general conditions of the contract for construction put out by the American Institute for Architects (AIA), and was required to continue with its work on the project and establish any extra costs at a later time. Cleveland points out that the AIA conditions were not attached to the contract and argues that such conditions were therefore not part of the contract. This argument fails because the conditions were incorporated by reference by the principal contract, and case law establishes that if conditions are incorporated by reference, a contractor

may not neglect to read them. See *Luczak Brothers, Inc. v. Generes* (1983), 116 Ill. App. 3d 286, 451 N.E.2d 1267.

Assuming, *arguendo,* that the AIA conditions were a part of the contract, the trial judge found that such conditions were not controlling, as the change regarding retention of the front ballroom wall involved a major change in the scope of the demolition contract and justified Cleveland's failure to proceed until a written change order acknowledging additional reasonable compensation was received.

Although case law does support the proposition that minor changes by the owner may be accepted as modifications, it also states that for a modification there can be no material change so as to constitute a radical or substantial departure from the original contract. (See *Bulley & Andrews, Inc. v. Symons Corp.* (1975), 25 Ill. App. 3d 696, 701, 323 N.E.2d 806, 810.) In the case at bar, C&E contends that Cleveland's contract was not substantially changed by the decision at issue and in fact argues at one point that Cleveland's work was actually decreased because it had less to demolish. This reasoning is inaccurate.

As a result of the decision to retain the front wall, Cleveland had to perform the delicate task of detaching the front wall without allowing it to be damaged by the surrounding demolition. To accomplish this, Cleveland deemed it necessary to leave the front wall attached to the balance of the ballroom as long as possible. The decision to retain the front wall not only entailed a slower, more delicate demolition operation, but also dictated a complete reversal of Cleveland's demolition schedule and sequencing. Now, rather than beginning with the demolition of the ballroom front wall, and proceeding with the balance of the ballroom to the north, Cleveland had to work in the opposite direction, commencing with the multistory wing and working south toward the wall which was to remain. The manner of demolition also had to be modified by the changed decision as Cleveland could not risk the vibrations caused by a large wrecking ball.

■ Thus, the facts support the trial judge's determination that the decision to retain the front wall, and the serious repercussions that decision had on Cleveland's work sequence constituted a major change in the scope of its contract and entitled it to a written change order acknowledging the additional costs involved. Consequently, any delay resulting from this significant decision was correctly chargeable to C&E rather than Cleveland.

■ C&E also maintains that it was not properly notified, as required by contract conditions, of the cost of the extra work to be performed by Cleveland in connection with the ballroom wall. C&E ne-

glects to note that Cleveland's requests for meetings to discuss the change in demolition met with opposition at every stage. As the trial judge noted, when Cleveland did submit figures as to what it believed would be the increased cost to demolish the ballroom, leaving the front wall standing, C&E belittled the method used to arrive at the cost. C&E should therefore not be heard to complain that either notification or itemization was inadequate.

Cleveland further argues that the major delay in the demolition project was due, not to C&E's failure to issue a written change order regarding the ballroom front wall, but to C&E's failure to timely construct column 14A.

Running through the multistory wing to be demolished was a column—old column 14a. It supported each floor through an attached beam running east and west connected with another vertical column, column 14 in the main building. The demolition and removal of floors 1 through 12 of the multistory wing and the 13th- and 14th-floor penthouses required demolition and removal of old column 14a as well as the eastern half of the beam running between old column 14a in the wing and column 14 in the main building. However, the removal of these structural elements would have left the beam unsupported at the eastern end, in turn leaving each floor in the northeast corner of the main building unsupported. To remedy this, the architect's plans called for construction of a new column 14A directly to the west of where the beam would be severed during construction. This new column 14A would run in a single line the full height of the building from the floor of the basement to the ceiling of the penthouse.

It was understood that C&E was to have column 14A fabricated and installed prior to Cleveland's instituting demolition work in that area. All of the Egidis understood that installation of column 14A was prerequisite to Cleveland's ability to demolish the multistory wing. This task was spelled out in Cleveland's bid proposal and in the final contract, which stated that "temporary and permanent shoring and bracing required for the support of the remaining structural members is the owner's responsibility in all areas."

Although C&E's contractual responsibility for column 14A was quite clear, this structure was not in place as of April 16, 1981, when Cleveland had completed its strip-out of all floors. In fact, Cleveland was unable to begin demolition of the multistory wing prior to June 1 when it received notice from C&E that this column had been installed. Thus, no matter how early Cleveland could have demolished the ballroom, with or without the wall, the demolition of the multi-

story wing could not have begun before it did, in the first part of June 1981.

C&E maintains that it did not have column 14A ready before June 1981 because it had anticipated that Cleveland would be working on the ballroom till that time. C&E further asserts that Cleveland unilaterally changed its demolition sequence and was thus itself responsible for any delay due to column 14A not being ready. As noted above, it was C&E's failure to provide written notice of its decision to retain the front ballroom wall which caused Cleveland to restructure its plan for demolition. The restructuring of this plan further impacted Cleveland's ability to quickly demolish the multistory wing, as it was no longer able to situate its crane close to the multistory wing as planned because the ballroom was still standing.

As the trial court found, Cleveland did not in any way prevent C&E or the owners from installing column 14A in a timely fashion. The trial court further found that "but for" the delays associated with the failure of C&E and the owners to timely install column 14A, Cleveland would have completed its demolition contract no later than July 11, 1981, before the onset of a strike by the operating engineers which lasted from July 22 to September 15, 1981, and further delayed completion of the project till December 1981.

For the above reasons we find, as did the trial judge, that all project delays were chargeable to C&E.

### III

C&E further maintains that the trial judge's conclusion that it was responsible for the six-month delay in completing the demolition contract and its corresponding award of delay damages to Cleveland is not supported by the judge's other findings of fact. C&E maintains that even if it is charged both with the period of delay attributable to the operating engineers strike, (56 days between July 22, 1981, to September 15, 1981), and the period of delay attributable to its failure to timely install column 14A (53 days between April 17, 1981, and June 8, 1981), such delays amount to only 109 days and not the six months charged to it by the trial judge. On this basis, C&E urges that it should be entitled to at least an apportionment of delay damages.

■ C&E's calculations fail to include periods of delay caused by its changed decision regarding the front ballroom wall, and its failure to complete its contractual obligations as regards marking and rerouting of utilities in the basement. Even though these delays were not precisely calculated by the trial judge, they must have contributed to his overall award of delay damages to Cleveland and his denial of

C&E's claims for apportionment of damages. Based on the totality of C&E's conduct throughout this operation, the judge's determination that delay damages should not be apportioned is indeed reasonable.

## IV

C&E additionally contends that the trial court incorrectly found that it had breached its contractual requirements with regards to marking and rerouting of utility lines. The disputed contract provisions provide:

### WORK INCLUDED

"5. Owner is responsible for marking existing telephone service and utility lines to remain; also marking all others in the basement that are to remain.

6. Owner is responsible for protection and maintenance of the existing water, sewer, and all utilities to remain.

7. All cut off and rerouting to be done by others prior to the start of the demolition work."

In the opinion and order of January 15, 1988, the trial judge interpreted these provisions as follows:

"Prior to strip-out work in the basement, the utilities lines and service lines for sewer and water had to be rerouted. This was necessary because there were existing stores occupied by the tenants. The court finds that all cut off work, rerouting of utilities and marking of the lines were to be done by others than Cleveland prior to start of demolition work. This was not to be a cooperative effort, but the sole responsibility of C&E defendant. There is no question in the Court's mind that the owner was responsible for protection of and maintenance of the water, sewer, and utility lines that were to remain. No serious concentrated effort was made to reroute and mark the utility and service lines. The Court finds that when C&E attempted in a haphazard manner to mark the lines they shifted their contractual obligation to Cleveland. The Court further finds that C&E determined it would not be economically feasible to them to mark and reroute the lines."

C&E argues that the above-quoted language of the opinion interpreted contract provisions 5, 6, and 7 as requiring it to reroute *all* lines. While this interpretation of the judge's opinion is arguable, a more precise reading is that the trial judge acknowledged not all lines would be rerouted when he stated that the owner was responsible for protection and maintenance of the water, sewer, and utility lines *that were to remain*. A more accurate interpretation of the judge's opinion

leads to the conclusion that C&E would reroute existing lines where required and mark everything else. This marking and rerouting were necessary in order to allow Cleveland to perform its strip-out work in the basement as quickly as possible without exposure to the hazards presented by live wires.

The judge's conclusions that C&E's attempts at marking and rerouting were minimal and perfunctory are supported by the record. Ben Wilson, Cleveland's general superintendent, testified that when Cleveland began its basement strip-out operations virtually none of the utility lines which were to remain were so marked. When he arrived in the basement, Wilson testified that operating electrical and plumbing lines were "all over the place." He saw no yellow flags where the lines would have been. Also, no rerouting or cut-off work had been accomplished. Wilson also testified that he complained almost every day to C&E's superintendent, who assured him the problem would be taken care of, but in fact never was. Finally, on May 8, written notice was provided to C&E officially complaining about the basement situation. (Although Robert Egidi, who testified for C&E, said that he believed all utilities had been marked as of May 8, his testimony was refuted by Ben Wilson.) Even the most generous interpretation of C&E's obligations as to the utility and plumbing lines would support the trial judge's conclusion of breach of contract and his subsequent award of additional costs to Cleveland necessitated by the "shifting" of C&E's obligation and the extra man hours required to work around the unmarked pipes and live wires.

C&E also argues that the trial court erred in admitting parole evidence in the form of precontract negotiations in order to clarify C&E's obligations as regards basement strip-out. Assuming, *arguendo,* that such testimony was erroneously admitted, and that this issue was preserved for appeal, any error would be harmless as the trial judge gave the contract language its plain and unambiguous interpretation. Furthermore, as noted above, any construction of C&E's obligations as regards basement strip-out operations would support a finding of breach.

C&E also contends that because Cleveland did not timely notify it of problems surrounding basement strip-out, it could not correct the situation. This argument was contradicted at trial by Ben Wilson's testimony that he complained almost daily to C&E about the live wires and unmarked pipes in the basement, although no formal written complaint was made until May 8, about one month after basement strip-out operations had begun. Furthermore, C&E was in breach of its contract obligations from the day basement strip-out be-

gan. It cannot therefore shift the blame for its own failure to perform responsibly by claiming lack of notification.

 We therefore find that the trial court correctly interpreted contract requirements pertaining to basement strip-out and appropriately assessed additional damages against C&E.

## V

Supreme Court Rule 220 (134 Ill. 2d R. 220) requires disclosure of "the identity of an expert" when he was not identified prior to trial in response to a Rule 220 interrogatory request. That rule requires disclosure of an expert who is retained to render an opinion at trial. Failure to do so disqualifies that witness at trial. 134 Ill. 2d R. 220(b)(1).

During the operating engineers strike, while Cleveland was not on the project site, the Egidis ordered their men to sever the front wall from the ballroom, leaving it free standing. When Cleveland learned of this, it had a structural engineer, Larry Reiss, investigate the safety and structural stability of that wall. Reiss' written report of September 26, 1981, was later forwarded to C&E.

During rebuttal, Reiss was called to testify under subpoena as to his report. Reiss testified that the front wall had been cut loose at the floor and the roof, and that no temporary bracing wall had been erected. He opined that this detachment weakened the wall's stability, creating a hazardous condition. Reiss felt that vibrations from surrounding demolition would tend to weaken the wall, increasing the likelihood of damage and collapse. C&E noted its standing objection to Reiss' testimony based upon his failure to be identified before trial pursuant to Supreme Court Rule 220.

Cleveland maintains that C&E's characterization of Reiss as an expert witness is incorrect, as Reiss was not an expert retained for trial. Rather, he was consulted in 1981 during the course of Cleveland's demolition work in order to determine the structural integrity of the wall as it then existed after it had been cut loose by C&E. The trial judge found this explanation persuasive, and relying on the appellate court opinion in *Diminskis v. Chicago Transit Authority* (1987), 155 Ill. App. 3d 585, 508 N.E.2d 215, allowed Reiss' testimony.

In *Diminskis,* defendant Chicago Transit Authority contested the propriety of the court's allowing plaintiff's treating physician to testify at trial when he had not been disclosed prior to trial as an expert witness. The reviewing court found that pursuant to a Rule 220 request, a plaintiff was not required to disclose the identity of a treating physician as an expert witness. The *Diminskis* court determined

that under Rule 220 only experts retained to render an opinion at trial fall within the definition of a Rule 220 expert. A typical treating physician is not retained by the patient for the purpose of giving trial testimony. On the contrary, the patient's relationship with the treating physician becomes necessary only because the patient has sought out the physician's assistance for treatment of a particular physical or mental illness. A treating physician's relationship with his patient is therefore not triggered by the filing of a lawsuit.

Since the *Diminskis* case, the Illinois Supreme Court has held that treating physicians, whose opinions are developed in the course of treating a patient, whether or not litigation is even pending or contemplated, are not expert witnesses within the meaning of Rule 220, and do not have to be disclosed even if their opinions have some value at trial. See *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 529 N.E.2d 525.

We conclude that Larry Reiss was similarly situated to a treating physician who was called on to diagnose a particular situation at the time it occurred. This situation was created by the unilateral action of the Egidis in ordering severance of the front wall of the ballroom during the operating engineer's strike when Cleveland was not on the project site. Even though litigation was unavoidable at the time Reiss rendered his opinion, he was not specifically called in anticipation of litigation. Therefore, he was not an expert whose identity was required to be revealed before trial pursuant to Supreme Court Rule 220.

## VI

C&E also argues that the award of deposition costs and witness fees for Wilson and Manzi are not justified by Supreme Court Rule 208(d). (107 Ill. 2d R. 208(d).) While Cleveland does not contest the merits of this appeal, it does contend that C&E's notice of appeal filed April 26, 1988, was prior to the court's May 5 award of these costs and that, therefore, the appeal does not include such costs. C&E asserts, and is supported by Illinois case law, that when a party appeals from a judgment, the appellate court has jurisdiction over a subsequent motion relating to a component of the judgment order, even though it is not specified in the notice of appeal. See *Oh Boy Grocers v. South East Food & Liquor, Inc.* (1979), 79 Ill. App. 3d 252, 398 N.E.2d 269.

C&E further maintains that the trial court improperly taxed to it the costs of depositions necessary to Cleveland's lawsuit. Here again, case law supports C&E's argument. In *Galowich v. Beech Aircraft*

*Corp.* (1982), 92 Ill. 2d 157, 441 N.E.2d 318, the Illinois Supreme Court found that although Rule 208(d) does allow for certain expenses incurred in the taking, transcribing, and filing of depositions to be taxed as costs, only when a deposition was a necessity, such as when a crucial witness died or disappeared at trial, could it properly be taxed as a cost to the losing party. (*Galowich*, 92 Ill. 2d at 162.) The *Galowich* court further noted that in Illinois, litigants must bear their own litigation and trial preparation expenses. Although this decision involved the issue of deposition costs in a circumstance of a voluntary dismissal, its principles have been followed when a full scale trial and preparatory depositions have been at issue. See *Galowich v. Beech Aircraft Corp.* (1991), 209 Ill. App. 3d 128, 568 N.E.2d 46 (which held that depositions used to refresh a recollection or impeach a witness were not "indispensable"). But see *In re Marriage of Lefler* (1988), 185 Ill. App. 3d 677, 542 N.E.2d 1 (which did award costs for a deposition without distinguishing the Supreme Court's narrow interpretation of Rule 208(d)).

▬ Relying on the two *Galowich* decisions, we find that the trial court's award of deposition costs to Cleveland was improper, as such depositions were not strictly indispensable to the trial of the case, as the witnesses involved had not died or disappeared.

▬ C&E additionally argues that witness fees were also incorrectly assessed as costs. C&E provides no supporting case law for this argument. Furthermore, *Galowich* does allow for witness fees to be awarded against the losing party while denying deposition costs. In *Lorsch v. Gibraltar Mutual Casualty Co.* (1970), 127 Ill. App. 2d 350, 262 N.E.2d 313, the appellate court held that witness fees may be taxed even when the witnesses have not testified. Since there seems to be no precedent for a narrow construction of the court's discretion to award witness fees, we find that the trial court's determination in this regard is correct.

## VII

▬ Cleveland appeals the denial of its motion to amend the judgment of foreclosure to make the additional named defendants (the Egidis) directly responsible for the money judgment without resort to a foreclosure sale. Cleveland grounds this argument on two separate theories. First, Cleveland argues that it is entitled to direct relief against these additional defendants based on its breach of contract claim. Cleveland asserts that because of the identity of interest between C&E and the Egidis, the contract it entered into with C&E was in actuality a contract with the Egidis, and that, therefore, actual

privity exists between it and the Egidis, thus providing the basis for breach of contract relief. An alternative form of this argument presents C&E as an agent of the Egidis and establishes direct liability through an agency theory.

In support of its breach of contract, unity of interest theory, Cleveland cites the Illinois Supreme Court decision of *Seymour v. Woodstock & Sycamore Traction Co.* (1917), 281 Ill. 84, 117 N.E. 729. The *Seymour* court did determine that a contract with a construction company was in actuality a contract with a defendant railroad, as the ownership of the construction company and the railroad was identical, officers, stockholders, and directors were the same, and in fact, the construction company had been organized for the sole purpose of constructing the railroad and had no other business. While these unity of interest arguments might be theoretically applicable to the case at bar, they were not developed in the trial court. The evidence adduced at trial established only that there was a written contract between Cleveland and C&E, Inc., a viable corporate entity. There was no evidence which would allow the trial judge to pierce the corporate veil and thus find privity of contract between the Egidis and Cleveland. Furthermore, there was no evidence which would support a finding that C&E was an agent of and controlled by the Egidis. Even though the trial judge did find a unity of interest between the Egidis and C&E, he specifically stated in the post-trial hearing that such findings pertained only to plaintiff's claim under the Illinois Mechanics' Liens Act and were not intended to be a ruling on corporate matters or whether C&E was a viable corporate entity, separate and distinct from its owners. Because these issues regarding identity of corporate interests had not been addressed during trial, the trial judge declined to find the Egidis liable to plaintiff on a breach of contract theory.

As an alternative to its breach of contract, unity of interest theory, Cleveland argues that the Egidis should be directly responsible for the money judgment awarded by the trial court based on section 28 of the Illinois Mechanics' Liens Act (Ill. Rev. Stat. 1981, ch. 82, par. 28), which does allow a subcontractor to secure a money judgment against the owner of a property without resort to foreclosure. Again, this cause of action may have held theoretical entitlement for Cleveland, but it was not pled and proved in the trial court.

In a post-trial hearing, Cleveland argued that a liberal construction of its pleadings would allow the court to grant this additional form of relief. To buttress this argument, Cleveland relied on the decision of *Bethlehem Steel Corp. v. Tishman-Adams, Inc.* (1977), 45 Ill. App. 3d 1003, 360 N.E.2d 475. In *Bethlehem,* a plaintiff subcontractor

had requested a lien on the property as well as "other appropriate relief." The trial judge in that case liberally construed the pleadings to allow for a direct money judgment against the owners of the property. In the instant action, Cleveland's prayer for relief requested the various remedies available under the Act. At paragraph (b) of count I of its amended complaint, Cleveland requested that the court adjudge the defendants jointly and severally liable to Cleveland in the amount of $301,119.86 plus interest. Cleveland argues that based on this language and the precedent established by *Bethlehem*, the trial judge incorrectly denied its motion to amend the judgment of foreclosure to include the Egidis.

The language of Cleveland's complaint and the precedent established by *Bethlehem* present a strong argument in favor of adding the Egidis to the initial judgment of foreclosure. However, as the trial judge noted in denying Cleveland's motion, relief under section 28 requires the plaintiff to submit additional evidence including proof of its *pro rata* share of available monies plus proof of improper payout procedures. This issue of additional required proofs was not addressed by the *Bethlehem* court. A determination which allowed Cleveland to include the Egidis as additional named defendants would ignore this requirement set out by section 28 of the Illinois Mechanics' Liens Act.

For the above reasons, we uphold the trial court's denial of Cleveland's motion to amend the judgment of foreclosure and sale to include additional named defendants.

We do not address the priority of liens in this case, as this issue was not before the court.

Accordingly, the judgment of the circuit court of Cook County is affirmed except for its award of deposition costs, which is reversed.

Affirmed in part, reversed in part.

LORENZ, P.J., and MURRAY, J., concur.